UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Hizam Yehia,

      Plaintiff,

v.                                                                    Case No. 19-12019

Michigan Department of Corrections, *et al.*,      Sean F. Cox
                                                                      United States District Court Judge
      Defendants.

_____/

**OPINION & ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff asserts employment discrimination and retaliation claims, and a related § 1983

claim, against his former employer, the Michigan Department of Corrections ("MDOC"), and

one of his supervisors there. The matter is before the Court on Defendants' Motion for Summary

Judgment. The parties have briefed the issues and the Court heard oral argument on October 29,

2020. For the reasons set forth below, the Court shall grant the motion in part and deny it in

part. More specifically, the Court shall grant the motion to the extent that it shall grant summary

judgment in Defendants' favor as to Plaintiff's disparate treatment, retaliation, and § 1983

claims. The Court shall deny the motion as to Plaintiff's hostile work environment claims

asserted under Title VII and Michigan's Elliott-Larsen Civil Rights Act and those claims will

proceed to trial.

**BACKGROUND**

On July 9, 2019, Plaintiff Hizam Yehia ("Plaintiff" or "Yehia") filed this action against

Defendants Michigan Department of Corrections ("MDOC") and Frank Sawyer, a Captain at the

MDOC ("Sawyer").  His complaint asserts the following claims: 1) "Retaliation" in violation of Michigan's Elliot-Larsen Civil Rights Act ("ELCRA") (Count I); 2) "Disparate Treatment" under ELCRA (Count II); 3) "Hostile Work Environment" under ELCRA (Count III); 4) "Hostile Work Environment" under Title VII (Count IV); 5) "Disparate Treatment" under Title VII (Count V); 6) "Hostile Work Environment" under Title VII (Count VI); and 7) § 1983 Claim for Violation of Equal Protection Clause Under Fourteenth Amendment (Count VII).[1]

Discovery closed on June 22, 2020.  On July 20, 2020, Defendants filed a Motion for Summary Judgment.  (ECF No. 31).

With respect to summary judgment motions, this Court's practice guidelines, included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a.  The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute.  The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .

> b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

> c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

---

[1] Thus, Plaintiff has asserted two separate counts titled "Hostile Work Environment" under Title VII, both asserted against the MDOC.  At the October 29, 2020 hearing, Plaintiff's counsel advised the Court that Count VI is a duplicative count included by error and that count should be dismissed.

(Scheduling Order at 2-3).

The parties complied with the Court's practice guidelines for summary judgment motions such that Defendants' motion includes a "Statement of Material Facts Not In Dispute" ("Defs.' "Stmt.") and Plaintiff's response brief includes a "Counter-Statement of Disputed Facts" ("Pl.' s Stmt.").

The following relevant material facts are gleaned from the evidence submitted by the parties, *viewed in the light most favorable to Plaintiff*, the non-moving party.

Plaintiff is a "Muslim-American and former corrections officer at the MDOC." (ECF No. 34 at PageID.1573).

**Plaintiff Begins Employment At MDOC**

Plaintiff began working at MDOC in March of 2015, when he started training at the MDOC academy. After eight weeks, Plaintiff began working at the Parnall Correctional Facility in Jackson, Michigan. (Stmts. at ¶ 24).

For the first year of employment, MDOC Corrections Officers ("C/Os") serve a probationary period. During that time, C/Os may not work alone. – they must have a partner for safety reasons. Single-person assignments include the gym, kitchen, and library. (Stmts. at ¶ 25).

Plaintiff routinely worked in the facility's administration building, which houses the visiting room, bubble, and Control Center. Plaintiff often worked in the Control Center and visiting room. "Roughly five" MDOC employees typically work in the Control Center: the Captain, Lieutenant, Sergeant, Count Officer, and Electronic Monitoring Officer. Two officers typically work in the visiting room: a regular officer and a "shakedown" officer. Plaintiff also worked in various other positions at the Facility, including the housing units, yard, gym, kitchen,

3

and law library.  (Stmts. at ¶¶ 26-28).

At MDOC, sergeants are first-line supervisors; lieutenants are second-line supervisors; and captains are third-line supervisors.  During the period relevant to this lawsuit, Plaintiff reported to Sergeants Jeffery Robinson (who handled his performance reviews), Derik Curtis, and Kendra Brown—who were his first line supervisors.  Plaintiff received the same or similar performance review score each year he worked for MDOC.  (Stmts. at ¶ 29).

During the relevant period, Plaintiff's second-line supervisors were Lieutenants Marsci Anderson, Derik Curtis (who was promoted to an Acting Lieutenant position), Mike Doss, and Josh Curtis.  His Captain was either Jeffery Lang or Franklin Sawyer.  Captain Sawyer was Plaintiff's third-line supervisor for about five months.  Before that, Captain Sawyer worked on Third Shift.  (Stmts. at ¶¶ 30-31).

During his employment, Plaintiff was a member of the Michigan Corrections Officers Union.  Plaintiff knew his union representative but never discussed any of his allegations of harassment, discrimination, or retaliation with his union representative and "kept it to himself." (Stmts. at ¶ 32).

**MDOC's Harassment Policy**

Throughout his tenure with MDOC, Plaintiff knew and understood the department's discriminatory harassment policy.  (Stmts. at ¶¶ 33 & 36).

Defendants attached a copy of the MDOC's written harassment policy as an exhibit and it includes the following:

RESPONSIBILITY OF EMPLOYEES

L.      All employees are prohibited from engaging in discriminatory harassment.
        In addition, supervisors and managers must make a good faith effort to

4

eliminate and prevent discriminatory harassment from occurring in their respective areas. Whenever a supervisor or manager becomes aware of allegations of, or witnesses, such behavior by any employee under his/her supervision, s/he shall refer the person allegedly harassed to the appropriate harassment counselor and report the alleged harassment to the appropriate harassment counselor to ensure the allegations are investigated in accordance with this policy.

(ECF No. 31-4 at PageID.716).

Plaintiff understood how to report a complaint: he used MDOC's complaint procedure once (October 2018)—his first and only written complaint to MDOC. Plaintiff also understood that failing to report an instance of discriminatory harassment could lead to discipline, including termination. (Stmts. at ¶¶ 34-35).

### Plaintiff Worked With Numerous Other Employees, In Various Areas

Plaintiff regularly worked in the Control Center with C/Os Acree-Manuel and Bryan Enrici. Plaintiff was work partners with Bryan Enrici and worked with Acree-Manuel at least twice per week. Acree-Manuel, Yehia, and Enrici watched out for each other. Plaintiff was friends with Acree-Manuel—they interacted with each outside work, including attending a Kevin Hart show together. (Stmts. at ¶¶ 37-38).

Plaintiff also worked with Sergeant Derik Curtis and Marsci Anderson in Control Center. Plaintiff likewise considered Anderson to be his friend; and he spent time outside work with Sergeant Derik Curtis and texted with him after he left MDOC. Plaintiff accuses neither Curtis nor Anderson of discrimination, retaliation, or harassment. (Stmts. at ¶ 39). Plaintiff does, however, accuse Derik Curtis and Marsci Anderson of failing to report discrimination. (Pl.'s Dep. at 146).

In August 2018—less than five months before his resignation—Captain Frank Sawyer

moved to Plaintiff's shift. (Ex J, Declaration of Franklin Sawyer, ¶¶2-7). (Stmts. at ¶ 40).

Plaintiff often worked overtime—voluntarily—on third shift with Captain Sawyer.  In 2018 alone, Plaintiff volunteered to work overtime hours on at least 22 occasions.  On 16 of those occasions, Plaintiff volunteered to work overtime while Captain Sawyer was the shift commander.  (Stmts. at ¶ 41-42).  Plaintiff did not have a permanent overtime position—which means his position could be moved based on the facility's business needs.  (Stmts. at ¶ 43).

### Plaintiff's Job Performance And Attendance Issues

Plaintiff received three written counselings for time and attendance during his time at MDOC—all before any alleged protected activity.  Plaintiff admits that he engaged in the conduct leading to the written counselings—and that they did not stem from his religion, weight, or national origin.  Other similarly situated C/Os were also counseled for time and attendance by the same supervisors.  (Stmts. ¶¶ 54-55).

Plaintiff did not experience a diminution of pay or changed job responsibilities from these written counselings.  Plaintiff received the same OR similar performance rating—Meets Expectations—every year.  Captain Sawyer never completed Plaintiff's reviews—his shift sergeants did.  (Stmts. at ¶ 56).

### Tardiness And October 2018 Complaint

Parnall Correctional Facility is a heavily controlled environment: it is a prison facility that houses inmates: "[a]nybody that's not in the facility or on their assignment at the time of the shift starts, that position has to be accounted for, has to be filled."  (Stmts at ¶ 57) (citing Dep. of Sgt. Kolonich).

Plaintiff had a history of tardiness in the days just before October 3—but never received

6

disciplined.  He arrived late four times in the three-week period before October 3. Similarly, on four other occasions in September, he punched in at 13:15—which means he was not on assignment at shift start.  Plaintiff—once again—arrived late to work on October 3.  (Stmts. ¶¶ 58-60).

If a C/O is not on assignment at second shift's start (13:15 hours), first shift cannot exit the facility—and the Sergeant (here, Kolonich) must mandate a C/O for overtime duty.  Plaintiff's late arrival meant that 20 C/Os could not leave the facility on that day.  Kolonich was mandating overtime to a C/O (mandatory overtime is not voluntary) because of Plaintiff's tardiness. Kolonich took Plaintiff aside: "[s]o I stepped into the bubble to talk to him about showing up on time to work yet again."  This was the "third or fourth time" Kolonich told Plaintiff to be on time. Plaintiff "laughed at me."  (Stmts. ¶¶ 61-63) (Citing Kolonich Dep.).  Kolonich similarly addressed tardiness with other C/Os.  (Stmts. at ¶  64).

**Plaintiff's October 9, 2018 MDOC Complaint About Kolonich**

On or about October 9, 2018, Sergeant Kendra Brown, a harassment counselor, met with Plaintiff so he could lodge a formal complaint against Kolonich.  Plaintiff alleged the following in his complaint against Kolonich:

> So as I, C/O Yehia enter the bubble area to report to my assignment Sergeant Kolonich asked me what time does shift start?  I replied 13:15 hours.  Sergeant Kolonich then replies you have to be on assignment at 13:15. I replied yes sir. Sergeant Kolonich then states, I don't have to look outside and break my neck to see you when you will come.  He said, and if not mando two of my first shift officers.  I said copy, Sarge. Sergeant Kolonich then replies, I need you to get here on fucking time, you got that.  I then walked away from Sergeant Kolonich and he continues to say, I don't expect to talk to you about this shit again.  Nothing was aside after that.  Sergeant Kolonich walks out of the bubble.

(Stmts. at ¶¶ 66-69).

Plaintiff's complaint, attached as part of Ex A-8, is what Plaintiff drafted with Sergeant Kendra Brown.  (Stmts. at ¶ 72).  The first page of the Complaint Form has a section where a box can be checked to indicate the type of discriminatory harassment being alleged and has various boxes, including national origin, religion, and weight.  On that page, none of those boxes were checked and the "OTHER" was written in handwriting.  (ECF No. 31-4 at PageID.691).

During his deposition, Plaintiff testified as follows regarding that complaint he made with Brown:

Q.   So you didn't check any box; is that correct?
A.   So I was questioned about this because I could have swore that I notated [sic], you know, religion and national origin.  And so that's on that document, which I don't know what happened there and I don't know who put down other because that's certainly not my handwriting.  I don't write in caps like that.
Q.   Okay, you didn't check any box, did you?
A.   On that document it shows that there's no boxes checked but I could have swore that I checked those boxes.
Q.   So you didn't – so you're saying you did check a box; is that right?
A.   Yeah.
Q.   So you're saying you checked a box and then what are saying happened after that?
A.   I checked the box and I'm looking at this document, there's no boxes checked and all I see is other on there.  And, again, I don't know how that appeared there, and --
Q.   Well, it looks like – I mean you said you filled this out with Kendra Brown, right?–
A.   Yeah.
Q.   Okay, that looks to me like pretty close to her handwriting, right?
A.   Right.
Q.   Okay.  And then you signed this document, right?
A.   Correct.
Q.   And there is no checked box, correct?
A.   I don't know.  I don't see no checked box.  Maybe – there's something on religion but I don't know if that's the continuation of my signature as you can see on there. There's a little slash right on there and I could have swore I also put a slash on national origin and weight, but they are not on there and it just shows other.
Q.   But you admit you signed this document, right?

A.     Correct.

Q.     And in your complaint you don't mention any comments about race, religion, or weight, do you?

A.     No, I do not, but I would like to put a statement out here, there is another document, which is a continuation of an investigation questionnaire given to me by Frank Sawyer regards Joshua Kolonich, which is MDOC 01627. I'm sorry, that was Sergeant Kolonich –

. . . .

Q.     Okay.

A.     So this questionnaire, I remember on question number five it said did you like to – do you have anything further you would like to add at this time. This was referred back to that document, the one we were just talking about.

        *On the back of this document, number 26, I put down that he called me [sic] did I bring my camel to work and him and Sawyer were laughing at me.  But on the back of that document it seems like they didn't upload it, and I remember I wrote a whole 'nother [sic] paragraph on the back.*

Q.     Okay.  Is that your signature on MDOC 1628; is that your signature there?

A.     Yes, 1628, correct.

Q.     And that's the date, November 4th, 2018?

A.     Correct.

Q.     Okay.  And when it says do you have anything further you'd like to add at this time, could you read what you wrote?

A.     So it said, yes, a week before this incident occurred Sergeant Kolonich was checking in staff at the front desk.  Upon my arrival in the front lobby Sergeant Kolonich indicated to me I had 30 seconds to punch in and go through all three gates. Once I waited at gate one Officer Patterson arrives in the lobby and punches in the front punch clock.  Sergeant Kolonich never said anything to him but harassed me numerous times regards coming on time when I actually arrive four to five minutes early to work.

Q.     Okay.  And in that paragraph you didn't mention anything related to race, national origin, or weight, did you?

A.     That's correct.

. . . .

Q.     You filed – Mr. Yehia, remember the complaint we discussed you filed against Mr. Kolonich?

. . . .

A.     Nothing was mentioned regards [sic] my national origin or, you know, my ethnicity or my religion, it was just directly –

Q.     By Kolonich?

A.     That's who I'm talking about, Kolonich, when I wrote the complaint on him. It was nothing towards him, it was just regards to him swearing at me and, you know.  *When I got to the questionnaire, on the back of that page I*

> *did mention that he kept harassing me throughout the months and he did*
> *mention that when did I bring my camel to work, which they never*
> *uploaded that document.*

Q.     And you don't have a copy of that, do you?

A.     I do not.

(Pl.'s Dep. at 127-28, 195-196) (emphasis added).

Another page of the complaint form asks "Why do you believe this situation constitutes a discriminatory harassment complaint?" the response was "creating hostile work environment." (ECF No. 31-4 at PageID.692).

The MDOC immediately investigated Plaintiff's complaint, reviewed surveillance video, and issued questionnaires to Plaintiff and witnesses. (Stmts. at ¶ 73). The questionnaire Plaintiff received asked him if he had anything to add. In his signed statement, Plaintiff wrote:

> Yes, a week before this incident occurred, Sgt. Kolonich was checking in staff at
> the front desk. Upon my arrival in the front lobby Sgt Kolonich indicated to me I
> had 30 seconds to punch in and go thru all 3 gates. Once I waited at gate one.
> Officer Patterson arrives in the lobby and punches in the front punch clock. Sgt.
> Kolonich never said anything to him, but harassed me numerous times regards
> coming in time when I actually arrive 4 to 5 min early to work.

(Stmts. at 74). During Plaintiff's second statement, he never mentioned harassment based on any protected class. (Stmts. at ¶ 74),

Based on the MDOC's investigation, Kolonich was held responsible for violating rules: No. 1 Humane Treatment of Individuals and No. 5 Conduct Unbecoming–Kolonich's first discipline. (Stmts. at ¶¶ 75-76). The MDOC's records included the following "Conclusion" section regarding the Complaint made by Plaintiff:

CONCLUSION:

Based on the evidence gathered through the investigative questionnaires there is
sufficient evidence to substantiate the accusation that Sergeant Joshua Kolonich
used profanity when dealing with Corrections Officer Hizam Yehia. This

investigation is closed and forwarded to the appointing authority for review.

Regarding the Work Rule Violations, there appears to be the following:

Suspect: JOSHUA L. KOLONICH
Allegation(s):

| | |
|---|---|
| #1 Humane Treatment of Individuals | Sufficient Evidence |
| #3 Discriminatory Harassment | Insufficient Evidence |
| #5 Conduct Unbecoming | Sufficient Evidence |

(ECF No. 31-4 at PageID.685).

Plaintiff never received any formal discipline from Kolonich—before or after his complaint—neither was his pay reduced, nor was he ever demoted.  (Stmts. at ¶ 77).

During this action, Plaintiff testified that although he made the above complaint about Kolonich, he did not report experiencing other discriminatory harassment while at the MDOC because he feared retaliation:

> Q.     So but you didn't – you filed a complaint against Sergeant Kolonich; did you have fear of reporting?
> A.     Right, I didn't fear the other parts, which the harassment, because at that point, you know, like I feared retaliation.  I feared like these guys would frame me or something to try to get me fired.  Like I said, I mean why would I report it, it was happening in the opening [sic].
> Q.     Where –
> A.     But I didn't report, I did not report the whole harassment as far as the race, religion thing and put down the other officers and the shift supervisors because, you know, like I said, fear of retaliation, my career is on the line, you know.  Why would I lie?  Again, why would I report something like this when it's in the open.  It's constant harassment, constant hostile work environment.

(Pl.'s Dep. at 149).

In October of 2018, Plaintiff applied for a job at the Prince William County Adult Detention Center in Virginia.

**November 4, 2020 Assignment To Housing Unit**

11

Plaintiff asserts that on November 4, 2020, he was moved to the Housing Unit in retaliation for having made his October 2020 Kolonich complaint. (Pl.'s Dep. at 170; EEOC Charge). Plaintiff testified:

> Q.   And then you say, on or about November 4, 2018, I was assigned to the housing unit. I have not been assigned to the housing until in about two years. Is that true and accurate?
> . . . .
> Q.   Okay. And are you saying that was in retaliation for what?
> A.   I believe that was for the Kolonich.
> Q.   So you're alleging that you were assigned to a housing unit during your regular shift in retaliation for the Kolonich complaint; is that correct?
> A.   Yes, because, like I said a couple moments ago where the sergeant or sometimes the lieutenant or the caption will assign the scheduling. I questioned that say when I was there, when I put in the housing unit, like I said, everyone came up to me, what are you doing here, who did you piss off? How did you come over here; they all said that. But I figured out later that day that Sergeant Kolonich was the shift schedule person who was moving around everybody.

(Pl.'s Dep. at 170-71).

Plaintiff concedes he worked in the housing units before—both on his regular shift and during his overtime hours. The MDO Union agreement also sets forth Management's Rights to assign C/Os to job positions based on the business needs of the Facility. (Stmts. at ¶¶ 46-47).

**Plaintiff's November 2018 EEOC Charge And Its Impact**

On or about November 13, 2018, Plaintiff filed an EEOC Charge alleging harassment based on religion and national origin and unlawful retaliation. (ECF No. 31-8 at PageID.910). The EEOC charge asserts that the conduct occurred from March 27, 2015 until November 13, 2018 and was continuing. The body of the EEOC Charge states:

> I began my employment with the above-named employer on or about March 27, 2016 and am currently employed as a Corrections Officer.
>
> Since I began my employment and continuing until the present, I have been

12

subjected to harassment in the form of derogatory comments and conduct based on my national origin and religion.  The harassment has occurred constantly and is often in the presence of command shift, who laugh along or engage in the harassment.  I have opposed the harassment, to no avail, in or around September 2018, I reported the harassment to internal affairs.  In or around October 26, 2018, I filed an EEO complaint with the above-named employer.  On or about October 26, 2018, I received a letter from Internal Affairs informing me that no harassment or discrimination was found.  I am continuously subjected to harassment based on my national origin and religion. On or about November 4, 2018, I was assigned to the housing unit. I have not been assigned the housing unit in about 2 years.

I believe I am being subjected to harassment and subjected to reassignment due to my national origin (Yemeni, Middle Eastern), religion (Islam) and in retaliation for reporting harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(*Id*).

Plaintiff did not mention Captain Sawyer's name in the charge.  (Stmts. at ¶ 78).  Before that EEOC Charge, the only complaint he ever filed was the October 2018 complaint on Kolonich's profanity.  (Stmts. at ¶ 79).

Plaintiff never received any discipline after his EEOC Charge.  (Stmts. at ¶ 85).

**Plaintiff Admits The Discriminatory Harassment *Stopped* After He Filed His EEOC Charge**

After the MDOC had notice of Plaintiff's EEOC Charge—in November of 2018—Plaintiff reported that the alleged discriminatory harassment stopped.  That is, Plaintiff reported to the EEOC that "since the EEOC served the MDOC," the harassment stopped.  (Stmts. at ¶ 86).

Plaintiff also reported that after he filed his EEOC Charge, ADW LaFave spoke with all Parnall shift commanders about the allegations and since then, "nothing has happened in the last week" and Capt. Sawyer:

has been nice to me and asking me if I need anything and how I am nice and I do a

13

good job and he picks on fletcher and other officers in front of me so I don't feel bad.

(Stmts. at ¶ 87).

### Plaintiff's Overtime Assignment Is Moved To The Gym On December 27, 2020

The second instance of retaliation alleged by Plaintiff is when, on December 27, 2020, his overtime assailment was moved to the gym.  (Stmts. at ¶ 49; Pl.'s Dep. at 112-13).  The gym is a single-person assignment, which means a senior officer (not a probationary officer) must work that position.  (Stmts. at ¶ 49)

That day, Plaintiff concedes: (a) Captain Sawyer told Plaintiff that he needed a senior officer in the gym and (b) that other officers had their overtime assignments moved.  Plaintiff labels the action as retaliatory because: (a) he did not receive a phone call about the move; and (b) and other senior officers could have worked the gym.  (Pl 113:8-17, 115:6-8). Plaintiff admits that the single overtime assignment did not lead to a pay cut or demotion—and his work hours never changed.  (Stmts. at ¶¶ 50-52).

C/O overtime assignments routinely change based on the business needs of the facility; and Plaintiff admits that he did not have a permanent overtime position (bid assignment) and permanent overtime positions are seniority-based. (Stmts. at ¶ 53).

### Plaintiff's Virginia Job Applications And Resignation At MDOC

Plaintiff's wife attended college in Virginia during various times from August 2015 until May of 2019.  (Stmts. at ¶¶ 89-90).  Plaintiff testified that his wife lived with him in Michigan around September 2017 to January 2018; and again, in June 2018 until they left for Virginia. (Stmts. at ¶ 91).

Plaintiff applied for a job at the Prince William County Adult Detention Center in Virginia

14

in October of 2018.  Prince William County notified Plaintiff that he was near the "end step of the

hiring process" in early January 2019.  Plaintiff's employment offer letter is dated January 23,

2019.

**Plaintiff Resigns His Employment At MDOC On January 23, 2019**

The following day, January 24, 2019, Plaintiff resigned his employment with MDOC and

moved to Virginia.  (Stmts. at ¶¶ 92-94).

Plaintiff resigned his employment at the MDOC on January 24th via a written notice to

Shift Command and Human Resources, with a Subject line that stated" Resignation Due To

Hostile Work Environment and Unaddressed Racism."  (ECF No. 31-2 at PageID.628).  The body

of the notice stated:

> It is with a heavy heart that I respectfully give my notice to resign from the State
> of Michigan Department of Corrections as a Corrections Officers E-9 effective
> January 24, 2019.  As you know, I have been discriminated and harassed for years
> based on my Arab descent and religious denomination, and I can no longer [sic]
> this environment.  My multiple complaints have gone unanswered.  Please accept
> this resignation as my goodbye to the department in the most sincere and
> respectful manner.
>
> I only hope that the Department offers more training among its Officers to correct
> its issues regarding harassment due to race, religion, and nationality among its staff
> throughout the Department and become [sic] a wonderful diverse workplace.

(*Id.*).

**Plaintiff's Work History After Leaving The MDOC**

Plaintiff began working in Virginia in February 2019—and resigned his employment there

about 4 weeks later. Plaintiff blames the MDOC for his resignation, stating:  I resigned this

employment as it brought back memories of when I was working at the Michigan Department of

Corrections. Just horrifying memories and upsetting moments and caused me to have anxiety and

panic attacks including depression. (Stmts. at ¶¶ 95-96).

Shortly after his resignation in Virginia, MDOC offered Plaintiff a job at a facility in Ypsilanti, Michigan.  But Michigan Civil Service Rules require a preemployment drug screen before starting.  HR Analyst Trayse Fowler arranged the drug screen near Plaintiff's Virginia location. (Stmts. at ¶¶ 105-107).

Around this same time, Plaintiff had also applied for a job at another facility.  (Stmts. at ¶ 115).

It is undisputed that Plaintiff did not end up taking the required drug test for the position he was offered at the MDOC.[2]  Rather, Plaintiff began working at his current job, at federal contractor Centerra-Constellis, where he earns around $38/hour (or $77,272.00 year)—$14/hour more than his MDOC hourly rate of $24.18. (Stmts. at ¶ 115).

**Plaintiff's Deposition Testimony About The Harassment He Encountered At The MDOC**

Plaintiff testified that he never felt physically threatened by Sergeant Kolonich or Captain Sawyer.  (Stmts. at ¶ 5).   But Plaintiff testified that Captain Sawyer made discriminatory or harassing comments to him and about him.  Plaintiff testified:

> Q.    Sure.  So you've alleged harassment, correct?
> A.    Yes.
> Q.    Okay. And harassment based on what?
> A.    Yes, through my religion, weight, my national origin.  You know, like I said, the whole ethnicity, and that was basically it.
> Q.    Okay . . . All right, you alleged in your complaint that Captain Sawyer said Middle Eastern men beat their women, fuck goats, blow themselves up, and that women cover their faces like ninjas; did I get that right?
> A.    That's correct.
> Q.    Okay. And when did he tell you that Middle Eastern men beat their

---

[2](Stmts. at ¶¶ 108-114).

| | women? |
|---|---|
| A. | Well, he said this with a few other officers in there.  Again, I can't recall the date but I'm sure that he said that.  Like I said, there's one time where he kept calling me goat fucker, camel jockey.  He had mentioned to me that, hey, Yehia, why are you so late to work? |
| | Like when I told you that I came a minute late, I was walking towards – to the camera room, control center, and he just told me, hey, did you bring your camel to work? And then Kolonich was right in there and he said, yeah, did you bring your camel to work, and just started laughing. Moments after Kolonich comes up to me and just asks me, hey, what are you wearing, huh, huh? And he just shrugged his eyebrows and he just says, what are you wearing under that vest, you know?  He says, you got that bomb vest on there today?  And he started laughing and walked away. |
| Q. | Okay.  And so you're saying Sergeant Kolonich heard those comments, who else? |
| A. | Cole, Timothy Cole. |

(Pl.'s Dep. at 187-88).  Plaintiff testified that another officer, Acree-Manual heard offensive

comments being made to Plaintiff in the workplace:

| Q. | And he heard which comment? |
|---|---|
| A. | He heard goat fucker, camel jockey, terrorist. |
| Q. | All right.  So he heard goat fucker, camel jockey; what else are you saying he heard? |
| A. | Terrorist, ISIS. This stuff happened constantly, you know. |

(Pl.'s Dep. at 188).

Plaintiff testified that such comments were made to him by Sawyer on multiple occasions

while both Plaintiff and Acree-Manual were present and that Acree-Manual told him that such

comments (eg., "get that goat fucker back here") were made in reference to him at times when

Plaintiff was not present.  (Pl.'s Dep. at 18-190).  He testified:

| Q. | Okay, so is this one occasion or – |
|---|---|
| A. | It was multiple. |
| Q. | Okay, multiple occasions.  And you're saying Acree-Manual came and told you, or what did Acree tell you? |
| A. | He just told me, he was like, man, this guy called you a goat fucker and he starts laughing.  But my thing is these are just examples of, you know, of it occurring.  It was all the time, it was constant, pervasive, it was just back to |

|     |                                                                                                          |
| --- | -------------------------------------------------------------------------------------------------------- |
|     | back.                                                                                                    |
| Q.  | And the camel jockey comment, who said that – or, I'm sorry, you said – you allege Mr. Sawyer said that.  When was that said? |
| A.  | I can't recall.  I know that he said that, all right, I was right there.                                  |
| Q.  | And –                                                                                                     |
| A.  | I was in the control center.  And then he mentioned it against when he was with Lieutenant Anderson speaking to her regarding something about prisoners.  I pull up from the camera room to ask him a question and he just stops the convo and looks right at me and says what do you want, camel?  And he looks back at Lt Anderson and she just opens her eyes in shock. |

(Pl.'s Dep. at 190-91).

Plaintiff testified that several officers and supervisors made comments to him, or in his presence, that he perceived as references to Muslim and /or Arabic persons being terrorists. For example, Plaintiff testified that when he would go into the control center, Gail Crittenden would frequently say things to him like "hey, please don't kill all the dogs or all cats" and would ask him "how is your bomb business going, did you get all your bomb parts selling on Amazon." (Pl.'s Dep. at 231-32).  Plaintiff testified that other officers, like Officers Barnes and Officer Eric Anderson, would hear those comments and would laugh or "giggle and smirk."  (*Id*. at 232-236). Plaintiff testified that he also believes that Captain Sawyer and Lieutenant Hughes where in the control center when some of those comments were made.  (*Id*. at 235).

Plaintiff testified that when officers were outside, in line to punch in, officers such as Amy Bungart and Officer O'Connor would say things to Plaintiff like "get behind the line, it's not the Middle East," and repeat it and laugh at Plaintiff.  (*Id*. at 227).  Plaintiff testified that Officer O'Connor would also say to him "hey, man, don't shoot up the place now every time there's a terrorist act, like a shooting spree, you know, he would mention to me, hey, please don't shoot up this place." (*Id*. at 227).

Plaintiff testified that the harassment from Officer Amy Bungart "was just non-stop," and

18

that she harassed him based on his national origin, his religion, and his weight.  He testified that

"[e]very time I ate food, you know, or ordered out food like a pizza place or wings or something

like that, that nature, she'd come up and look what I ate and say, eww, why are you eating that,

you're going to catch a heart attack.  You already a big fat guy, you need to work out."  (*Id*. at

223-24).  "And she'd always, always pick on me every single time and then, you know, just

constant harassment.  And she'd say, you know, if we're in the line, she'd say, hey, get back in

that kumquat line because we have rules in the U.S., you know."  (*Id*. at 224).

Plaintiff testified that one day Officer O'Connor and Officer Dan Bantilan brought two

pots of chili to work and one contained pork.  Plaintiff testified that those men switched the lids to

the pots and that Plaintiff ended up eating some chili containing pork.  When he realized this,

Plaintiff asked them "why would you guys do that to me?" and the men laughed at Plaintiff and

said "Dude, I don't see you turning into fire," "aren't you supposed to go to hell right away after

you eat this."  (*Id*. at 227-28).

Plaintiff testified that Officer Terry would join in when Officer Crittenden was making fun

of Plaintiff and Terry once said to Plaintiff, "you're a piece of shit, you're a lazy fat fuck."  (*Id*. at

247).  Plaintiff testified that Terry once said to him, "if at any time you're getting your ass kicked

by an inmate I'm not going to be there to help you."  (*Id*. at 248).

Plaintiff testified that on one occasion, Officer McClinchey approached him in the control

center and started cussing him out and called Plaintiff "a fat lazy shit."  (Pl.'s Dep. at 252).

Plaintiff testified that Officer Hampton knew that Plaintiff was Arabic and made harassing

and discriminatory comments to him:

Q.     And Officer Hampton, what are you accusing him of?
A.     So Officer Hampton, when I first started working there he just started

coming in the control – not the control but the administrative building through the front gate when I shook down individuals. He kept coming into me, he knew that I was Arabic, so he would say, hey, as-salaam-alaikum habibi, like peace be upon you, my man, you know.  And I looked at him kind of shocked and I said, hey, can we please not talk in Arabic like this because it's for my safety near inmates, prisoners. He said, okay, okay, he said, I'm sorry.  I said, that's fine, just please don't do it again.

So it was like moments down the road he actually came up to me and said, hey, Yehia, we worked in 16 south at one point together, I worked for overtime on third shift with him.  He mentioned, hey, I bet you're an ISIS leader, recruiting leader.

I said, wait, what?  He said I know you're an ISIS recruit leader and you're here to recruit officers and prisoners to join the ISIS force. I said why would you say something like that?  He said I know, he said I bet you have some – at your house, in your garage you have ball bearings or ordered to make the bomb, a very big bomb, you now, a dirty bomb, that's what he called it.

So I got up at one point, I just went next door, which was 16 north, to hang out with them because I just didn't want to hear it.  It was constant, constant harassment back to back with him.  And then –

. . . .

A.      That's fine, that's okay.  So what I was saying was after he mentioned all this stuff prisoners would come surround us, right, because we'd broken them to come out to use the phone and for day activities, the rooms to hang out, play chest [sic], whatever the stuff is.  After they would come out, the prisoners would be around us, he'd look at me and say, hey, you know this guy is an ISIS leader?  Yeah, he speaks Arabic.

And then they would be like, hey.  I told him please, can you stop it, I've already told you once, can you stop, man.  He just kept going. And then from that like prisoners started knowing that I was Arabic and I was Muslim, and, you know, I didn't want them to know because I don't want them saying, of, yeah, you my brother, I want a favor because we're brothers from Islam.

And I don't want to hear that, you know, I'm here to work just like everybody else, get my money and go home.  And these are just examples of constant harassment.  They are not meant to be all inclusive, and every day was someone else, you know.

Q.      So he didn't accuse you of making bomb parts, did he?

A.      He did.  He said – actually at one point he came to control center while I was there 'cause I go sometimes after my break and Critten would be over there, Crittenden, Gale Crittenden. And he would talk to her, you know, Yehia, he does the ball bearings.

She said what the heck is that?  He said he told her the ball bearings

> that make the dirty bomb, you know the little balls that go inside the bombs
> that people made, like crockpots or something like that.  I said wow.  You
> know, they just laughed, they kept laughing.

Q.      So Officer Hampton, he was the – was he one of the individuals – he was
        the one that made the ball bearing or the alleged ball bearing comment?

A.      Yes, him and Ray Clawson, it's like they were saying the same things.

(Pl.'s Dep. at 236-38).

Plaintiff further testified that "other officers had mentioned bomb vests and shooting up

the place with [his] AK 47, things like that."  (*Id*. at 239 & 221-22).

Plaintiff testified that Officer Clawson would sometimes approach him in the control

center and "he would like try to like an active like choke, you know, he'd try and grab my back

and just choke it. And I would always break away and tell him can you stop doing that and then

he'll start laughing."  (*Id*. at 239-40).

Plaintiff testified that Officer Leffler also make frequent comments to him, along with

physical touching, that he perceived as harassment:

> A.      Leffler always came up to me and just said like allah allah akbar boom.  It
> seemed like he just liked that one comment, he kept saying it forever and
> ever, it was just constant.  Every time he left first shirt assignment and he
> was ready to leave they always come out to punch out near the control
> center, which is the administrative building, which I worked in control
> center.
>          He'd always come, he'd come mess around, laugh a little bit before
> he'd leave.  And every time he seen me, every time he had eyes on me he
> would always mention allah allah akbar boom, you know, and everybody
> would start laughing.
>          And he would also say, hey, Yehia, wait up, and I'll turn around
> and be like what do you want, you know? He'll run up to me, he'll start
> patting my chest, my back area, he'd say, oh, I'm just making sure you
> don't got that bomb vest, I don't want to die today.

(Pl.'s Dep. at 241-42).

Plaintiff testified that he did not report the harassing conduct because it was all done "out

in the open," and supervisors saw it and "the supervisors were in on it too," including Captain

Sawyer, Lieutenant Kliner, and Sergeant Kolonich.  (*Id*. at 240-41 & 250).  He testified that they

"treated me less than a human, you know.  The harassment was open and everybody observed it,

majority of the people observed it.  It was in front of people, they all knew about it, you know,

like why didn't they report it."  (*Id*. at 248).  Plaintiff testified that "[e]veryone knew about it, you

know, if was open.  It wasn't secret among the staff and supervisors.  I feel it almost became a

part of daily life, you know, I just came to expect it."  (*Id*. at 249).  Plaintiff testified that he did

not report the harassment because he feared retaliation: "I was super scared.  And like I said, I

was sick to my stomach. I couldn't deal with it."  (*Id*. at 253).

**Testimony Of Some Other C/Os At MDOC Regarding The Harassment**

C/O Arnold Kocibelli was employed at Parnall Correctional Facility while Plaintiff

worked there.  He submitted a Declaration stating that: 1) while Plaintiff was present, Officer

Scott Pack made the comment, "there goes your people at it again" at the time of the London

terrorists attacks; 2) the following day, while Plaintiff was going through the metal detector,

someone said "that might be a bomb;" 3) he heard someone say that Plaintiff married his cousin,

while Plaintiff was not present; 4) Plaintiff told him another officer made a comment about

Plaintiff's weight but he was not present for that; 5) an officer referred to Muslims as "Mussies"

but Plaintiff was not present for that comment.  (ECF No. 31-24).

C/O Michael Herman was also employed at Parnall Correctional Facility while Plaintiff

worked there.  He submitted a Declaration stating that while he cannot recall the dates of the

names of the people that made the comments, he heard several comments that were made to

Plaintiff.  Herman states that: 1) he heard another officer ask Plaintiff if he "was riding his camel"

to work when he reported to his post in Control Center; 2) he heard someone refer to Plaintiff as a

"terrorist" when Plaintiff handed his badge to an employee at the front gate; 3) on one occasion in 2016 or 2107, Officer Bungart viewed a Facebook video of Plaintiff shooting a firearm at a shooting range and asked out loud, "they let him have that thing?"; 4) he heard another employee make a derogatory comment to Plaintiff about marrying his cousin but does not recall who it was; 5) during a break in the lunchroom, the news aired footage of the conflict with ISIS in the Middle East and he heard a co-worker say to Plaintiff, "there are your people," in reference to the news footage of ISIS; 6) he heard another co-worker make a comment to Plaintiff about his weight. (ECF No. 31-25).

The Affidavit attached to Herman's Declaration states that Herman worked at Parnall from 2013 through September of 2018.  Herman states that he "personally observed [Plaintiff] harassed at Parnall on the basis of his race, national origin, weight, and religion.  The harassment was regular, consistent, and pervasive, and I personally observed it at least once a week." (*Id.*). His affidavit states that coworkers "denigrated and belittled [Plaintiff's] marriage, stating he married his cousin and calling his marriage to his wife 'disgusting.'"   Herman's Affidavit further states:

> 4.     The harassment was out-in-the-open and blatant, and often done in front of supervisors, and sometimes the supervisors participated in it.
> 5.     I could see that the pervasive harassment was wearing on [Plaintiff], who began showing signs of depression, sadness, anxiety, stress and would comment about how it was upsetting him, such as stating "I can't handle this anymore."

(*Id.* at PageID.1210-11).

C/O Tony White was also employed at Parnall Correctional Facility while Plaintiff worked there.  White would see Plaintiff around shift change for about three to five minutes.  He submitted a Declaration stating that while he cannot recall the names of the people that made the

comments, he heard comments directed to Plaintiff from other C/Os based on his national origin and weight during shift change.  (ECF No. 31-26).  The  affidavit White signed, which is attached to his declaration, gave examples of the comments he heard: 1) coworkers would talk to Plaintiff about having a bomb, saying things like "hopefully you don't have a bomb strapped to you today." 2) he was always the center of singling out and joke about Arabs; 3) One day Hizam had to run to respond to an incident at the prison and coworkers called him fat and made fun of his weight; 4) coworkers claiming that Plaintiff might shoot up the place; 5) Plaintiff was called a "terrorist," told he was "part of ISIS," and mocked about having bombs and things related to terrorist bombings.  (ECF No. 31-26 at PageID.1218).

White's Affidavit, attached to his Declaration, states that "[i]t was well known in the facility that [Plaintiff] was harassed and made fun of because he was Arab-American.  The harassment often occurred in the gate area, where all of the employees have to line up to get in and out of the prison, and there would be 20 to 30 officers in this area when [Plaintiff] was harassed."  (*Id.*).  White's Affidavit also states: "I could see that the pervasive harassment was wearing on [Plaintiff] because he came [sic] sullen and depressed as time went on and it kept going on," and the "harassment of [Plaintiff] went on for years while he was employed at the Parnall."  (*Id.*).

## ANALYSIS

### I.  Hostile Work Environment Claims (Counts III & IV)

Plaintiff's Complaint includes hostile work environment counts asserted against the MDOC under Title VII and the ELCRA.

Plaintiff claims he incurred a hostile work environment due to harassment about his

24

national origin, his religion, and his weight.  Weight is a protected class under the ELCRA but not under Title VII.

Among the cases Defendants cite is *Collette v. Stein-Mart, Inc*., 126 F. App'x 678 (6th Cir. 2005).  In that case, the Court appeared to recognize two slightly different hostile work environment claims: 1) a traditional or "garden variety" hostile work environment claim, wherein the plaintiff alleges that discriminatory harassment gave rise to a hostile work environment; and 2) a claim alleging constructive discharge in the wake of such harassment.  *Collette, supra*, at 681-82.  Defendants refer to this second claim as hostile work environment-constructive discharge.

Defendants' opening brief addresses the claim they perceive Plaintiff as asserting, hostile work environment-constructive discharge.  They contend that they are entitled to summary judgment in their favor as to that claim because: 1) Plaintiff cannot show "intolerable" working conditions; and 2) Plaintiff cannot show an "intent" on the part of MDOC to get Plaintiff to quit.

In responding to Defendants' motion, however, Plaintiff takes the position that he is asserting a traditional hostile work environment claim, not a hostile work environment-constructive discharge claim.  (*See* Pl.'s Br. at 6) (Stating that constructive discharge has no bearing on "Mr. Yehia's hostile work environment claim.).  Plaintiff notes the prima facie case that applies to traditional hostile work environment claims, as set forth in *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F2d 475 484 (6th Cir. 1990), and asserts that he has put forth enough evidence to create a jury question as to this claim.

In their reply, Defendants take the position that Plaintiff cannot meet his burden as to a traditional hostile work environment claim and challenges only two elements of the prima facie

25

case.

As explained below, this Court concludes that Plaintiff has submitted sufficient evidence establish a prima facie case of a traditional hostile work environment claim.

To establish a prima facie case of a hostile work environment based on circumstantial evidence, a plaintiff must show: 1) he is a member of a protected class; 2) he was subject to unwelcome harassment; 3) the harassment was based on the protected classes or characteristic; 4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and 5) the employer knew or should have known about the harassment and failed to act. *Stewart v. Esper*, 815 F. App'x 8, 21 (6th Cir. 2020) (citing *Williams v. CSX Transp. Co., Inc.,* 643 F.3d 502, 511 (6th Cir. 2011)). "The alleged incident of unwelcome harassment are to be considered together to determine whether, under the totality of the circumstances, they constitute a hostile work environment." *Stewart, supra*. Here, Defendants' motion challenges the fourth and fifth elements.

## 1.     Sufficiently Severe Or Pervasive

At the summary judgment phase, the Court looks to the totality of the alleged discriminatory harassment to determine whether is was sufficiently severe or pervasive enough to alter the conditions the plaintiff's employment and create an abusive working environment. *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017). In determining whether a hostile work environment exists, the Court looks to all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct.

2061, 153 L.Ed.2d 106 (2002)).

The Sixth Circuit has "established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile environment theory." *Phillips, supra.* Isolated incidents, unless extremely serious, are not sufficient. "Thus, occasional offensive utterances do not rise to the level required to create a hostile work environment because, '[t]o hold otherwise would risk changing Title VII into a code of workplace civility.'" *Phillips, supra* at 327 (citations omitted).

Viewing the evidence presented in the light most favorable to Plaintiff, he has presented sufficient evidence to create an issue of fact as to whether the alleged harassment was sufficiently severe or pervasive.

Plaintiff testified the discriminatory harassment was very frequent, nearly continual, during his several years of employment at the Parnall facility. The evidence construed in Plaintiff's favor also shows the harassment was severe – being called a "goat fucker," being accused of being a member of ISIS and bringing bombs into the prison, being tricked into eating pork against his religious beliefs, derogatory comments about his marriage, etc. And while Plaintiff testified he did not feel physically threatened, he testified that the harassment included other officers telling him they would not come to his aid if he had a physical encounter with an inmate. The alleged harassment also includes conduct that could be considered physically humiliating – having coworkers touch his chest or back to check for bombs, and being placed in a choke hold that he would have to break free from.

In arguing this element is not met, Defense Counsel seeks to discredit Plaintiff's own testimony as "self-serving," and tries to minimize the number of incidents that others admit they saw. Defendants also seek to present evidence from persons who say they did not harass Plaintiff

or observe others doing so.  Defendants also argue the harassment must not have been that bad or

Plaintiff would not have worked overtime hours or considered coming back to work at the

MDOC.  But the Court does not make credibility judgments at the summary judgment phase.

Here, Plaintiff's deposition testimony alone is likely sufficient to establish the severe or pervasive

element.  In addition, there are declarations or affidavits from other C/Os that support this

element.

### 2.    Employer Liability

The fifth element of a prima facie claim of hostile work environment is employer liability

– showing that the employer knew or should have known about the harassment and failed to act.

*Stewart v. Esper*, 815 F. App'x 8, 21 (6th Cir. 2020) (citing *Williams v. CSX Transp. Co., Inc.*,

643 F.3d 502, 511 (6th Cir. 2011)).

As their final issue presented in their motion, Defendant argue that the *"Farrager/Ellerth*

defense applies because Defendant MDOC exercised reasonable care to prevent and correct

harassing behavior and Plaintiff never reported harassing behavior stemming from a protected

class."  (Defs.' Br. at 18).  Rather than include this as a separate issue, the Court includes this

issue here in analyzing the hostile work environment claim.  That is because a *Farrager/Ellerth*

defense relates to the fifth element of a prima facie case of hostile work environment – whether

there is a basis for employer liability.  *Thornton v. Federal Express Corp.*, 530 F.3d 451, 456 (6th

Cir. 2008).

"Because strict liability is imposed on employers for the harassing conduct of their

supervisors, there is an exception to liability for the employer: so long as the harassment did not

result in a negative tangible employment action for the victim, the employer has an available

affirmative defense." *Clark v. United Parcel Service, Inc*., 400 F.3d 341, 348 (6th Cir. 2005).

Here, Plaintiff's hostile work environment claim is not based on a tangible employment action

and, therefore, the MDOC can assert a *Farrager/Ellerth* affirmative defense.

"To avail itself of this defense, the employer must show by a preponderance of the

evidence that (a) 'the employer exercised reasonable care to prevent and correct promptly any

[discriminatory] harassing behavior, and (b) that the plaintiff employee unreasonably failed to

take advantage of any preventive or corrective opportunities provided by the employer or to avoid

harm otherwise.'" *Clark, supra* (citations omitted).

This "affirmative defense encompasses active and inactive components: before the

employer can benefit from the defense, it must prove both that it *acted* reasonably in preventing

and correcting harassment and that the victimized employee unreasonably *failed to act* by not

utilizing complaint opportunities.  The employer will loss this defense if it fails either prong."

*Clark, supra*, at 349 (emphasis in original).

"Generally, an employer satisfied the first part of this two-part standard when it has

promulgated *and* enforced" a policy regarding discriminatory harassment.  *Thornton*, 530 F.3d at

456 (emphasis added).  In *Clark*, the Sixth Circuit explained:

> Under the first prong of the defense, employers "have an affirmative duty to
> prevent sexual harassment by supervisors." *See Williams*, 187 F.3d at 561. "The
> law is clear that an employer may not stand by and allow an employee to be
> subjected to a course of racial and/or sexual harassment by co-workers or
> supervisors. Rather, once an employer has knowledge of the harassment, the law
> imposes upon the employer a duty to take reasonable steps to eliminate it." *Torres
> v. Pisano*, 116 F.3d 625, 636–37 (2d Cir. 1997) (internal quotation marks and
> citations omitted). Thus, regardless of whether the victimized employee actively
> complained, prong one of the defense ensures that an employer will not escape
> vicarious liability if it was aware of the harassment but did nothing to correct it or
> prevent it from occurring in the future. *See Perry v. Harris Chernin, Inc*., 126 F.3d
> 1010, 1014 (7th Cir. 1997) (stating that the "only chance to save [plaintiff's] claim

29

> (and send it to the jury) would be if [the employer] had reason to know of the
> harassment on its own"). While the affirmative duty on the part of the employer
> will often include the requirement that it have some sort of sexual harassment
> policy in place, the duty does not end there. Prong one of the affirmative defense
> requires an inquiry that looks behind the face of a policy to determine whether the
> policy was effective in practice in reasonably preventing and correcting any
> harassing behavior. *See Faragher*, 524 U.S. at 806, 118 S.Ct. 2275 (stating that an
> employer may satisfy its burden if it has a "proven, effective mechanism for
> reporting and resolving" harassment); *Barna,* 172 F.3d 47 (finding that the inquiry
> under prong one is whether, upon having some notification of alleged harassment,
> the employer adequately investigated and responded to the situation).

*Clark, supra,* at 349.  Thus, in determining whether the employer took reasonable care in

preventing and promptly correcting the alleged discriminatory harassment, the Court must look

not only to the employer's harassment policy, but also "to its implementation of that policy."  *Id.*

An "effective harassment policy should *at least*: (1) require supervisors to report incidents

of [discriminatory] harassment; (2) permit both informal and formal complaints of harassment to

be made; (3) provide a mechanism for bypassing a harassing supervisor when making a

complaint; and (4) provide for training regarding the policy."  *Thornton*, 530 F.3d at 456 (citing

*Clark, supra*) (emphasis added).

Even if an employer has a facially sufficient policy on paper, it must also be an effective

policy in practice in order for the employer to avail itself of this affirmative defense.  *Clark*, 400

F.3d at 350.   In *Clark*, the employer and the EEOC argued that none of the supervisors who

witnessed an employee's discriminatory harassment towards the plaintiff "took any action

towards stopping the harassment."  *Id.*  The Sixth Circuit noted that there was evidence to

establish some of the employer's supervisors had witnessed several of alleged harassing

comments or incidents.  The court found that, while it was "unlikely that any of th[o]se individual

incidents alone created a hostile work environment," there was a "real question as to whether the

supervisors should have taken the first step towards prevention and correction by reporting these incidents" to the employer's personnel, as was directed by the employer's written policy. *Clark, supra*, at 350. Thus, the issue of whether the employer, via those supervisors, exercised reasonable care was one for the jury. *Id*. As such, the employer could not benefit from the affirmative defense at the summary judgment stage. *Id.* at 351.

The second part of this affirmative defense, and the one that Defendants focus on, is whether the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. They liken their situation to the one in *Thornton* and assert that they have established this affirmative defense because Plaintiff never reported the discriminatory harassment.

But this Court need not even address that second part of the affirmative defense because Defendants have not put forth sufficient evidence to get past the first hurdle of having a minimally-sufficient discriminatory harassment policy.

Again, the employer's written policy on discriminatory harassment has to, "at least," do all of the following: 1) require supervisors to report incidents of discriminatory harassment; 2) permit both informal and formal complaints of harassment to be made; 3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and 4) provide for training regarding the policy. *Thornton*, 530 F.3d at 456. Defendants have not shown that the MDOC's harassment policy contains those provisions. As such, the MDOC has not established that, at the summary judgment phase of this case, that it is entitled to this affirmative defense.

In sum, the Court concludes that Plaintiff has put forth sufficient evidence to create an issue of fact as to the two challenged aspects of a prima facie claim of hostile work environment.

The hostile work environment claims shall proceed to trial.

### B.    Disparate Treatment Discrimination Claims (Counts II And VI)

In Counts II and VI of his complaint, Plaintiff asserts disparate treatment discrimination claims under Title VII and the ELCRA.

Title VII provides that an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Michigan's ELCRA also prohibits such discrimination and disparate treatment claims under it are analyzed the same as Title VII claims.

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to proceed with a sex or race discrimination claim. Here, Plaintiff does not claim that his disparate treatment claims are supported by an direct evidence. Thus, he seeks to proceed via circumstantial evidence.

Discrimination claims supported by circumstantial evidence are examined using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. If the defendant articulates such a reason, then the burden shifts to the plaintiff to demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination.

A plaintiff can refute the legitimate, nondiscriminatory reason that a defendant offers to justify an adverse action by showing that the proffered reason: 1) had no basis in fact; 2) did not

actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct. *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003).

Where, as here, a case is at the summary judgment stage, a plaintiff seeking to prove discrimination via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's legitimate, nondiscriminatory reasons for its actions are a pretext for unlawful discrimination. *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

Under this framework, Plaintiff must first make out a prima facie case of discrimination, which requires him to show that: 1) he is a member of a protected class; 2) he was subjected to an adverse employment action; 3) he was qualified for the position; and 4) similarly situated non-protected employees were treated more favorably. *Jackson v. VHS Detroit Receiving Hosp., Inc.,* 814 F.3d 769, 776 (6th Cir. 2016).

In this case, Defendants contend that summary judgment in their favor is warranted because: 1) Plaintiff did not suffer an actionable adverse employment action; 2) even if the events he complains of did constitute adverse employment actions, he cannot show that any similarly-situated non-protected employees were treated more favorably.

First, Defendants contend that Plaintiff cannot pursue a disparate treatment claim because he did not suffer an adverse employment action.

In *Stewart v. Esper*, 815 F. App'x 8 (6th Cir. 2020), the Sixth Circuit explained as follows regarding what constitutes an actionable adverse employment action:

> An adverse employment action is a "materially adverse change in the terms or conditions of ... employment because of [the] employer's conduct." *Mitchell v. Vanderbilt Univ*., 389 F.3d 177, 182 (6th Cir. 2004) (alterations in original) (quoting *Kocsis v. Multi–Care Mgmt., Inc*., 97 F.3d 876, 885 (6th Cir. 1996)). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

33

responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Other material adverse actions such as "a less distinguished title, diminished options for advancement, or other unique indices" can constitute adverse employment actions. *Freeman v. Potter*, 200 F. App'x 439, 442 (6th Cir. 2006) (citations omitted). But not every act affecting an individual's employment constitutes a materially adverse change. *McMillian v. Potter*, 130 F. App'x 793, 796 (6th Cir. 2005). "Reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) (citations omitted). And de minimis employment actions are not materially adverse. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). Whether something constitutes an adverse employment action is viewed objectively, and the question is whether the employment action was "objectively intolerable to a reasonable person." *Policastro*, 297 F.3d at 539.

*Id.* at 16.

Second, Defendants take the position that even if the events Plaintiffs complains of did constitute adverse employment actions, he cannot show that any similarly-situated non-protected employees were treated more favorably.

As to this fourth element of the prima facie case of disparate treatment discrimination, the Sixth Circuit has explained that:

> To show that a similarly situated non-protected employee was treated more favorably, the plaintiff must show that the employee who was treated more favorably is similar to the plaintiff in "all *relevant* respects." *Ercegovich v.Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (emphasis in original). The other employee or employees ordinarily "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 364 (6th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). For the plaintiff to meet her burden, she must do more than make "generalized and vague allegations" that another employee was treated better than her. *See Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 147 (6th Cir. 2007).

*Stewart*, 815 F. A'ppx at 17.

The Court first considers whether there has been an actionable adverse action.  If not, the inquiry ends there.  If there is an actionable adverse action, then the Court considers whether Plaintiff can meet the final element of a prima facie case of disparate treatment.

Taking an open-ended approach in response to Defendants' challenge, Plaintiff asserts that "[t]here were a variety of potential adverse employment actions that create a material question of fact for the trier of fact."  (Pl.'s Br. at 10).  From his brief, it appears that he believes the following are actionable adverse actions: 1) having received "written counseling" (Pl.'s Br. at 10); 2) being assigned to the housing unit, a position he argues is "an inferior position," shortly after he filed his September 2018 complaint (*Id*. at 10-11); 3) having a co-worker, Amy Bungart, tell Plaintiff "hey, get back in the kumquat line because we have rules in the U.S., you know." (Pl.'s Br. at 12); and 4) being constructively discharged from his job. (Pl.'s Br. at 12).

### 1.    Having Received Written Counseling

Plaintiff received three written counselings for time and attendance during his time at MDOC—all before any alleged protected activity.  Plaintiff admits, however, that: 1) he engaged in the conduct leading to the written counselings, 2) the counselings did not stem from his religion, weight, or national origin; and 3) other similarly situated C/Os were also counseled for time and attendance by the same supervisors.  (Stmts. ¶¶ 54-55).  As such, Plaintiff cannot proceed with a disparate treatment claim based upon those written counselings.

### 2.    Being Assigned To Housing Unit

Plaintiff appears to take the position that his being assigned to the housing unit on November 4, 2018, constitutes an adverse employment action for purposes of a disparate treatment claim.  (Pl.'s Br. at 10-11).

In his facts statement, Plaintiff asserts that the move to the housing unit "amounted to a de facto demotion." (Pl.'s Stmt. at ¶ 48). Plaintiff testified that some co-workers asked him "who did you piss off?" after he received that assignment, suggesting that assignment is undesirable for some reason. (Pl.'s Dep. at 178). Plaintiff does not explain how or why that assignment could be undesirable to a reasonable person.

Moreover, it is undisputed that assignment did not result in a pay cut and Plaintiff's job title, salary, or benefits did not change. And Plaintiff concedes he had worked in the housing units before – both on his regular shift and during his overtime hours. (Stmts. at ¶ 46). Such "[r]eassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." *Policastro*, 297 F.3d at 539. Plaintiff's subjective impression concerning the desirability of one assignment over another is not sufficient "to render an employer's action materially adverse." *Freeman v. Potter*, 200 F. App'x 439, 443 (6th Cir. 2006).

Plaintiff cannot proceed with a disparate treatment claim based on this assignment.

### 3. Comment From Co-Worker

Next, Plaintiff's briefs appears to suggest that having had a co-worker, Amy Bungart make a single comment to him is somehow an actionable adverse employment action. He alleges that a co-worker said to him, "hey, get back in that kumquat line because we have rules in the U.S., you know." (Pl.'s Br. at 12). Plaintiff has offered no legal authority, however, to support his suggestion that such a comment could constitute an adverse employment action for purposes of a disparate treatment claim.

### 4. Constructive Discharge

36

Finally, Plaintiff asserts that his alleged constructive discharge can constitute an adverse employment action for purposes of his discrimination claims.  Thus, although Plaintiff is not asserting a hostile work environment claim based on constructive discharge, he is asserting that he was constructively discharged and that is an adverse employment action for purposes of his disparate treatment claims.

As this Court has previously noted, "[b]oth federal law and Michigan law recognize a constructive discharge as an adverse employment action."  *Bialek v. American Color Graphics, Inc.*, 2011 WL at * 7 (E.D. Mich. 2011); *see also Funk v. City of Lansing, Michigan*, 821 F. App'x 574, 580 (6th Cir. 2020) ("A constructive discharge is an adverse employment action for purposes of Title VII.").

"A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employees working conditions so intolerable that the employee is forced into an involuntary resignation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014); *see also Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).  For a traditional[3] constructive discharge claim, a plaintiff must show that: 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; and 2) the employer did so with the intention of forcing the employee to quit.  *Id.*

Notably, in this case Plaintiff acknowledges that once the MDOC had notice of Plaintiff's

---

[3]The Sixth Circuit has recognized that, "in addition to a traditional constructive discharge claim alleging discriminatory harassment," when an employer acts in a manner so as to communicate to a reasonable employee that he will be terminated, and the plaintiff resigns, the employer's conduct may also amount to a constructive discharge.  *Laster, supra.*  Here, Plaintiff does not assert this alternative kind of constructive discharge, where the "handwriting was on the wall and the axe was about to fall."

November 13, 2018 EEOC Charge, the *alleged discriminatory harassment stopped*. This is a critical admission because Plaintiff continued to work at the MDOC after the alleged harassment stopped. The alleged harassment stopped mid November of 2018 and Plaintiff continued working at MDOC for another two full months before he resigned on January 23, 2019. The Court concludes that this is fatal to a claim that Plaintiff was constructively discharged because a reasonable person would not feel compelled to resign his position eight weeks after all harassment stopped.

### C. Retaliation Claims In Counts I And IV

Plaintiff has alleged that he suffered retaliation twice: 1) once, when he was assigned to a housing unit; and 2) again when his overtime position was moved. (Stmts at ¶ 44).

Defendants' motion asserts that they are entitled to summary judgment as to Plaintiff's Retaliation claims asserted in Counts I and IV because Plaintiff cannot show that he suffered an adverse employment action for purposes of this claim. They further assert that even if Plaintiff could establish that either of those assignments constitutes an adverse action for purposes of a retaliation claim, the claims still fail because Plaintiff: 1) cannot establish a causal connection between those actions and his protected conduct; and 2) even if he could, Plaintiff cannot show that Defendants' legitimate, non-discriminatory reasons for why it made those assignments are a pretext for retaliation.

In response to the motion, however, Plaintiff has abandoned his retaliation claims. (*See* 10/29/20 Hrg. Tr., wherein Plaintiff's Counsel confirmed that Plaintiff has abandoned his retaliation claims). Thus, the Court shall dismiss the retaliation claims with prejudice.

### D. Section 1983 Claim Against Sawyer

Count VII of Plaintiff's Complaint asserts a claim against Defendant Sawyer alone titled "Equal Protection Violation Of Constitutional Rights Under the Fourteenth Amendment Of The Constitution Pursuant To 42 U.S.C. § 1983."   This 1983 claim was brought against Sawyer because the Sixth Circuit holds that "an individual employee/supervisor who does not otherwise qualify as an 'employer' may not be sued under Title VII." *Weberg v. Franks*, 229 F.3d 514, 522 n.7 (6th Cir. 2000).

"Because both Title VII and § 1983 prohibit discriminatory employment practices by public employers," the Sixth Circuit looks to Title VII cases "for assistance in analyzing race discrimination in the public employment context under § 1983." *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000).

Here, Plaintiff is asserting a claim that Sawyer violated his Constitutional rights by creating a hostile work environment for Plaintiff.  (*See* Pl.'s Br. at 15) (Referring to this count against Sawyer as Plaintiff's "§ 1983 hostile work environment claim.").

In challenging this count against Sawyer, Defendants' Summary Judgment Motion asserts that Sawyer is entitled to qualified immunity as to this claim and that Plaintiff's purported evidence does not support his accusations against him.

To state a claim under § 1983, a plaintiff must set forth facts that, when construed favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the United States; 2) caused by a person acting under the color of state law.  *Dominguez v. Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009).  Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.  *Id.; Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008).  Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation. *Dominguez*, 555 F.3d at 549.  Each defendant's liability must be assessed individually based on his [or her] own actions."  *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

Here, Captain Sawyer is the only named Defendant in this count, that alleges he created a hostile work environment.  The Court must ask, viewing the facts in the light most favorable to Plaintiff, has he shown that Sawyer violated Plaintiff's constitutional rights by creating a hostile work environment based on race.

Plaintiff has identified evidence, that if believed, would show that Sawyer made a few comments during the four years of Plaintiff's employment with the MDOC that could be perceived as harassment based upon race or national origin:

- Captain Sawyer remarked several times to Plaintiff that he would never travel to the middle east because they beat up women, "fuck goats", and "blow [themselves] up".  (Ex. 1, 187: 3-8).

- Additionally, Captain Sawyer told Plaintiff that if Plaintiff was going to "blow up" the Parnall facility to do so on his day off.  (Ex. 1, 226: 11-16).

(Pl.'s Br. at 16).  Those isolated comments by Sawyer are insufficient to establish that Sawyer created a hostile work environment for Plaintiff.  Thus, Plaintiff has not identified any authority that would show such limited comments would establish a constitutional violation.  Plaintiff has failed to meet his burden of establishing that Sawyer is not entitled to qualified immunity and the

§ 1983 count against Sawyer shall be dismissed with prejudice.

####    E.      Front Pay Damages Issue

Defendant's motion includes, as one the questions presented, "Are front-pay damages cut off because Defendant MDOC offered Plaintiff an unconditional return-to-work after Plaintiff resigned from his Prince William County, Virginia job?"  (ECF No. 31 at PageID.556).  This issue is addressed on page 6 of their brief, wherein Defendants assert that because Plaintiff did not accept the job he was offered at the MDOC, Plaintiff is not able to recover "front pay" damages.  (*See* Defs.' Br. at 6) (Arguing that "[a]ny damages for front pay are forfeited. *Grace v. City of Detroit*, 341 F. Supp.2d 709, 717 (E.D. 2004), *aff'd,* 216 F. App'x 485 (6th Cir. 2007)").

Plaintiff failed to address this issue in his response brief.  At the hearing, Plaintiff's Counsel asserted that Plaintiff may be entitled to front pay if the Court were to allow his disparate treatment claim, based upon an alleged constructive discharge, to proceed.  As discussed above, however, the Court concludes that Plaintiff cannot proceed with such a claim.  As such, it appears undisputed that Plaintiff cannot obtain an award of front pay damages in this case.

**CONCLUSION & ORDER**

For the reasons set forth above, IT IS ORDERED that Defendants' summary judgment motion is GRANTED IN PART AND DENIED IN PART.  The motion is GRANTED to the extent that Counts I, II, V, VI, and VII are DISMISSED WITH PREJUDICE.  The motion is DENIED as to Counts III and IV, and those traditional hostile work environment claims shall proceed to trial.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  November 2, 2020